IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, AIR TRANSPORT DIVISION, LOCAL 555, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 3:14-cv-00103-G |
| SOUTHWEST AIRLINES CO., | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Tom A. Jerman (*pro hac vice* application pending)
Donald J. Munro (D.C. Bar No. 453600)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939
(202) 626-1700 FAX
tjerman@jonesday.com
dmunro@jonesday.com

Brian M. Jorgensen
(Texas Bar No. 24012930)
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201-1568
(214) 220-3939
(214) 969-5100
bmjorgensen@jonesday.com

J. Joe Harris
(Texas Bar No. 090620000)
Senior Labor Counsel
Southwest Airlines Co.
2702 Love Field Drive
(214) 792-4561
(214) 792-4066
Joe.harris@wnco.com

Counsel for Defendant
Southwest Airlines Co.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

    A.    The Parties to this Action.......................................................................... 2

    B.    The Company's Declaration of an Operational Emergency at Chicago's  Midway Airport on January 7, 2014 ....................................... 4

    C.    The Contractual Basis for the Company's Declaration of Emergency ............................................................................................... 10

    D.    The Challenged Fact-Finding Hearings ................................................. 12

ARGUMENT .................................................................................................................. 13

    I.    TWU HAS NOT IDENTIFIED ANY EMERGENCY REQUIRING A TEMPORARY RESTRAINING ORDER........................................... 13

    II.    TWU'S CLAIMS RAISE A MINOR DISPUTE WITHIN THE EXCLUSIVE  JURISDICTION OF AN ADJUSTMENT BOARD UNDER THE RLA ................................................................................... 14

        A.    Applicable Legal Principles................................................... 14

        B.    The Parties' Dispute Is a Minor Dispute................................ 18

            1.    Agreement Language Supports Southwest ................................. 18

            2.    Southwest Arguably Retains a Managerial Prerogative ............. 20

            3.    Past Practice Arguably Supports Southwest's Position .............. 23

    III.    TWU Local 555 Cannot Show Irreparable Harm ............................... 24

    IV.    The Balance of Harms and the Public Interest Support Southwest ..................... 24

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

CASES

*AFA v. Horizon Air Indus., Inc.,*
    280 F.3d 901 (9th Cir. 2001) ...............................................................................16

*AFA v. Mesa Air Group,*
    567 F.3d 1043 (9th Cir. 2009) ...............................................................15, 17, 22

*AFA v. United Airlines,*
    976 F.2d 102 (2d Cir. 1992)...................................................................................16

*Airline Prof'ls Ass'n v. APX Air, Inc.,*
    400 F.3d 411 (6th Cir. 2005) ...............................................................................17

*Allied Pilots Ass'n v. American Airlines, Inc.,*
    898 F.2d 462 (5th Cir. 1990) ...............................................................14, 15, 16, 17

*ALPA v. Alaska Airlines, Inc.,*
    898 F.2d 1393 (9th Cir. 1990) ...............................................................................16

*ALPA v. Eastern Air Lines, Inc.,*
    869 F.2d 1518 (D.C. Cir. 1989)...................................................................15, 16

*ALPA v. Guilford Transp.,*
    399 F.3d 89 (1st Cir. 2005)...................................................................................16

*APA v. ABX Air, Inc.,*
    274 F.3d 1023 (6th Cir. 2001) ...............................................................16, 22

*Ass'n of Prof'l Flight Attendants v. American Airlines,*
    1988 WL 25428 (9th Cir. 1988) .............................................................................22

*Bhd. of Locomotive Firemen & Enginemen v. S. Pac. Co.,*
    447 F.2d 1127 (5th Cir. 1971) ...............................................................................16

*BLE v. Burlington N. R.R.,*
    838 F.2d 1102 (9th Cir. 1988) ...............................................................................16

*BLE v. Long Island R.R.,*
    85 F.3d 35 (2d Cir. 1996) .......................................................................................16

*BMWE v. Union Pac. R.R.,*
    19 Fed. Appx. 731 (10th Cir. 2000).......................................................................16

*BMWE v. Union Pac. R.R.,*
    475 F. Supp. 2d 819 (N.D. Iowa 2007)...................................................................23

*BNSF Ry. Co. v. United Transp. Union,*
  2010 U.S. Dist. LEXIS 137266 (N.D. Tex. Dec. 28, 2010) ....................................................23

*BNSF Ry. v. BLET,*
  337 F. App'x 409 (5th Cir. 2009) ...........................................................................................16

*BNSF Ry. v. BLET,*
  337 F. App'x 409 (5th Cir. 2009) ...........................................................................................15

*BRAC v. Atchison, T. & S.F. Ry.,*
  847 F.2d 403 (7th Cir. 1988) .................................................................................................16

*BRC v. Missouri Pac. R.R.,*
  944 F.2d 1422 (8th Cir. 1991) ...............................................................................................16

*BRS v. Burlington N. R.R.,*
  829 F.2d 617 (7th Cir. 1987) .................................................................................................16

*BRS v. Burlington N. R.R.,*
  893 F.2d 199 (8th Cir. 1990) .................................................................................................16

*Buchanan v. United States Postal Service,*
  508 F.2d 259 (5th Cir. 1975) .................................................................................................13

*Burlington N. R.R. v. BMWE,*
  961 F.2d 86 (5th Cir. 1992) .............................................................................................14, 17

*Chicago & N.W. Transp. Co. v. RLEA,*
  908 F.2d 144 (7th Cir. 1990) .................................................................................................17

*Chicago & N.W. Transp. v. IBEW,*
  829 F.2d 1424 (7th Cir. 1987) ...............................................................................................16

*Consol. Rail Corp. v. RLEA,*
  491 U.S. 299 (1989) .........................................................................1, 14, 15, 16, 17, 25

*Empresa Ecuatoriana de Aviacion v. Machinists,*
  690 F.2d 838 (11th Cir. 1982) ...............................................................................................17

*Firmin v. Richard Constr., Inc.,*
  Civ. A. No. 12-1391, 2012 U.S. Dist. LEXIS 81048 (E.D. La. June 11, 2012) ....................24

*Int'l Bhd. of Teamsters v. Southwest Airlines Co.,*
  875 F.2d 1129 (5th Cir. 1989) (en banc) .........................................................15, 21, 22, 23

*Long Island R.R. v. IAMAW,*
  709 F. Supp. 376 (S.D.N.Y. 1989) .........................................................................................18

*NRLC v. IAM*,
830 F.2d 741 (7th Cir. 1987) ...............................................................................16

*Pate v. Ameriquest Mortg. Co.*,
No. 4:10cv201, 2010 U.S. Dist. LEXIS 65472 (E.D. Tex. July 1, 2010)...............................24

*RCM Techs., Inc. v. Beacon Hill Staffing Group, LLC*,
502 F. Supp. 2d 70 (D.D.C. 2007)........................................................................24

*RLEA v. Chesapeake W. Ry.*,
915 F.2d 116 (4th Cir. 1990) ...............................................................................16

*RLEA v. Norfolk & Western R.R.*,
833 F.2d 700 (7th Cir. 1987) ...............................................................................16

*Ruby v. TACA Int'l Airlines, S.A.*,
439 F.2d 1359 (5th Cir. 1971) .............................................................................15

*Rutland Ry. v. BLE*,
307 F.2d 21 (2d Cir. 1962).................................................................................22

*Schiltz v. Burlington N. R.R.*,
115 F.3d 1407 (8th Cir. 1997) .............................................................................15

*Sheet Metal Workers Int'l Ass'n v. Kansas City S. Ry.*,
2009 U.S. Dist. LEXIS 104376 (W.D. Miss. Nov. 9, 2009) ..................................18

*Southwest Airlines, Inc. and TWU Local 555* (Hill, 2011) .....................................5, 12

*Southwest Airlines, Inc. and TWU Local 555* (Hill, 2012) .........................................4

*Southwest Airlines, Inc. and TWU Local 556* (Helburn, 1998) .............................10, 19

*UTU v. CSX*,
893 F.2d 584 (3d Cir. 1990)..............................................................................16, 17

**STATUTES**

45 U.S.C. § 151 *et seq*................................................................................................1

45 U.S.C. § 151a ...................................................................................................14

45 U.S.C. § 152 Seventh .........................................................................................14

45 U.S.C. § 153 First (i)........................................................................................1, 14

**OTHER AUTHORITIES**

RAILWAY LABOR ACT, ABA Section of Labor and Employment Law (3d ed. 2012)..................17

## PRELIMINARY STATEMENT

Defendant Southwest Airlines Co. ("Southwest") is engaged in a labor dispute with the union that represents its ramp workers, plaintiff Transport Workers Union of America, AFL-CIO, Air Transport Division Local 555 ("TWU Local 555"). The dispute concerns Southwest's right to declare a temporary state of operational emergency at its Chicago, Illinois facility in order to maintain flight operations during periods of unusually high employee absenteeism. More specifically, TWU Local 555 objects to Southwest's requirement that employees provide a doctor's note to substantiate their reasons for taking sick leave during an operational emergency. The carrier maintains that it has a managerial right to do so, and that nothing in the parties' collective bargaining agreement ("CBA") restricts its rights in this regard. The union, by contrast, denies that Southwest may declare an operational emergency and impose temporary sick leave requirements, and asserts that by doing so, the carrier is "unilaterally changing" the CBA.

The immediate issue before the Court is ***not*** who is right or wrong about the merits of the operational emergency, but only whether the parties' dispute should be classified as "major" or "minor" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*. A dispute is "minor" if it implicates the "interpretation or application" of an express or implied collective bargaining agreement. *See* 45 U.S.C. § 153 First (i). If an airline asserts that a disputed action is permissible under its labor agreements, the dispute must be deemed minor unless the carrier's proffered interpretation of the agreement is "frivolous or obviously insubstantial." *Consolidated Rail Corp. v. RLEA*, 491 U.S. 299, 303-04, 312 (1989) ("*Conrail*"). Minor disputes must be submitted to final and binding arbitration. *Id.*

In this case, the parties' disagreement is a quintessential minor dispute. Southwest's position that nothing in the applicable CBA restricts its right to declare an operational emergency is at least "arguably justified" and is not "frivolous." The union fails to identify any provision in the CBA that restricts the carrier's actions, and instead relies on a conception of management rights that is contrary to well-established precedent. The union seems to assume that the CBA must give Southwest the right to act, when, in fact, Southwest is entitled to act unless contractually restricted. Moreover, several provisions in the CBA at least arguably give Southwest an affirmative right to take the contested actions. Southwest's past practice relating to operational emergencies in similar situations also supports its position here.

TWU Local 555 will not be irreparably harmed by a denial of the injunctive relief it seeks; the union will merely be required to comply with the statutory arbitration mechanism, and if Southwest's interpretation of the parties' agreement is ultimately deemed incorrect, the employees can obtain complete relief in arbitration. By contrast, Southwest would suffer irreparable harm if an injunction was issued, as an injunction would hamper its ability to respond to operational challenges and potentially disrupt its operations. Thus, the Court should deny the union's request for a TRO.

## STATEMENT OF FACTS

### A.     The Parties to this Action.

Southwest is the nation's largest domestic airline, serving more than 95 cities with more than 3200 daily flights throughout the United States. Declaration of Steve Goldberg[1] ("Goldberg Decl.") ¶ 2 (App. 3-4). TWU Local 555 is the certified bargaining representative pursuant to the

---

[1]        The declarations cited herein and the exhibits thereto are contained in an appendix filed contemporaneously with this Opposition. Citations to the declarations include references to the corresponding page number of the appendix.

RLA of the "craft or class" of ramp service employees employed by Southwest.  *Id*.  Ramp service employees perform virtually all of the ground functions "under the wing" of the aircraft required to operate an airline, including loading and unloading of baggage or other cargo, delivery of baggage to the airport's baggage claim area, towing or directing aircraft departing or approaching a gate and operation of ground equipment.  *Id*.  During winter operations, ramp service employees are also responsible for deicing aircraft and snow removal.  *Id*.

TWU was certified as the bargaining representative of ramp service employees in 2000, replacing an "in-house" union.  Declaration of Christina Bennett ("Bennett Decl.") ¶ 2 (App. 11-12).  The first collective bargaining agreement between Southwest and Local 555 was effective on June 14, 2001, and became "amendable" pursuant to the RLA on June 30, 2006.  *Id*.  The second agreement, a complete copy of which was filed with the TWU's moving papers as TWU Exhibit 2, was effective on July 1, 2008, and became amendable on June 30, 2011.  *Id*.  The parties have been in negotiations for a new collective bargaining agreement since 2011.  Pursuant to Section 6 of the RLA, however, the existing provisions of the 2008-11 agreement, including the provisions requiring that all disputes be submitted to final and binding arbitration remain in effect until the parties reach agreement on a successor agreement or are released by the National Mediation Board to exercise self-help.  *Id*.

TWU, through different locals, also represents the Company's flight attendants, flight crew training instructors and dispatchers and the Company's collective bargaining agreements with those groups contain a number of general provisions that are similar or identical.  Bennett Decl. ¶ 3 (App. 12).  In particular, all of the agreements include some form of "management rights" provisions.  For example, Article 1.A of the Southwest-Local 555 Agreement provides:

> The purpose of this Agreement is, in the mutual interest of the Company, the Union, and the Employees, to provide for the operation of the Company under

methods which shall further, to the fullest extent possible, the well-being of Southwest's Customers, the efficiency of operations, and the continuation of employment under reasonable working conditions.  It is recognized to be the duty of the Company, the Union, and the Employees to cooperate fully to attain these purposes.

Similarly, Article 2 of the Southwest-Local 555 Agreement provides:

> C.   **Reasonable Work Rules.**  Employees covered by this Agreement shall be governed by all reasonable Company rules and regulations previously or hereafter issued by proper authority of the Company which are not in conflict with the terms and conditions of this Agreement and which have been made available to covered Employees and the Union Office prior to becoming effective.
>
> D.   **Management Rights.**  The right to manage and direct the work force, subject to the provisions of this Agreement, is vested in and retained by the Company.

Where the language of agreements is similar, labor arbitrators may apply precedents under one agreement to disputes under another agreement.  *See, e.g.*, *Southwest Airlines, Inc. and TWU Local 555* (Hill, 2012) at 17, 36.[2]

## B.   The Company's Declaration of an Operational Emergency at Chicago's Midway Airport on January 7, 2014.

Chicago's Midway Airport ("Midway" or "MDW") is Southwest's largest hub with approximately 225 daily departures.  Goldberg Decl. ¶ 3 (App. 4).  Southwest employs approximately 550 ramp service employees at Midway of which approximately 300 are assigned to work each day.  In projecting its staffing needs, Southwest must project the number of employees who will "call off" each day, a term that includes "no shows," sick calls, "reported personal absences," which is unpaid personal leave, or similar absences.  *Id*.  On a system-wide basis, approximately 5 percent of the ramp service employees will call off each day.  *Id*.  At Midway, the average number of call-offs among ramp service employees is typically between 15

---

[2]      A copy of this Award is attached as Exhibit A to the Declaration of Christina Bennett filed concurrently herewith (App. 14-53).

and 20 employees, representing 5 to 6 percent of the 300 employees scheduled to work each day. *Id*.

Southwest relies largely on overtime to maintain service levels during periods of unusually high load factors, irregular operations or inclement weather, including deicing and snow removal during the winter months.  Goldberg Decl. ¶ 4 (App. 4).  The availability of overtime is viewed as a highly-prized perquisite of employment that allows ramp service employees to increase their income substantially if they desire.  *Id*.  While Southwest could supplement its workforce through staffing agencies to deal with unanticipated needs, Local 555 has challenged the use of contractors.  *Id*.  *See generally Southwest Airlines, Inc. and TWU Local 555 Re: MCO Subcontracting* (Hill, 2011) at 28 (upholding use of contractor employees over objection of Local 555).[3]

Under Article 7 of the Local 555 agreement, overtime must first be assigned to employees who have requested the assignment of voluntary overtime, which is paid at 1.5 times the employee's regular rate.  Goldberg Decl. ¶ 5 (App. 4-5).  At Midway, the number of employees who sign up for voluntary overtime is typically 70 to 80.  *Id*.  If inadequate volunteers are available, however, the work is assigned through the use of mandatory overtime at double the regular rate.  *Id*.  In practice, however,  employees assigned "mandatory" overtime often sought the overtime but did not sign up for voluntary overtime because they recognized that the Company would likely have to assign mandatory overtime and wanted to be paid at the higher rate.  *Id*.

The circumstances that led to the Company's Declaration of Operational Emergency on

---

[3]        A copy of this Award is attached as Exhibit B to the Declaration of Christina Bennett filed concurrently herewith.

January 7, 2014 begin in late December 2013, when the Company began to experience an inexplicable increase in call-offs among the MDW ramp service employees.  Goldberg Decl. ¶ 6 (App. 5-6).  Call-off rates had been slightly elevated throughout December 2013, and the Company anticipated a spike in calls on December 31, 2013, and January 1, 2014, because of an historical pattern of increased sick calls on those dates among all employee groups.  *Id*.  While the Company planned for 30 to 40 call-offs on those dates, which would have been 10-12% of the employees assigned to work on those days, the actual number of call-offs was 56 (19%) on December 31, 2013, and 101 on January 1, 2014 (33%).  Thus, the number of sick calls on New Year's Day was roughly six times normal, an inexplicable increase even when the historical patterns of increased sick calls on New Year's Day is taken into account.  *Id*.  As a result of the unprecedented level of sick calls and adverse weather that increased the work load for Midway's ramp service employees, Southwest was forced to use a substantial amount of mandatory overtime on both days, assigning 182 shifts of mandatory overtime on January 1, 2014.  *Id*.

The assignment of large amounts of mandatory overtime, however, can aggravate staffing problems because of a work rule in the Local 555 agreement called the "ten hour rest rule."  *Id*. Under that rule, an employee who is assigned mandatory overtime is entitled to at least ten hours off at the end of mandatory overtime of four hours or more.  An employee invoking the rule is entitled to ten hours off ***and*** pay for any shift for which they were scheduled during the ten hour rest period.  *Id*.  The ten hour rule can be waived, and by waiving the rule the employee earns double time for any work during the ten-hour period.  *Id*.  During the time period at issue in this case, however, Southwest experienced an unusually large number of employees refusing to waive the rule, forcing the Company to fill another shift with mandatory overtime rather than working the scheduled shift at double time.  *Id*.

6

While Southwest cannot definitively identify the reason for the increased sick calls among ramp service employees in Midway at this time, it was widely perceived to be a coordinated job action to protest the slow progress in collective bargaining that had been ongoing since 2011.  Goldberg Decl. ¶ 7 (App. 6).  That perception, in turn, made it more difficult for Southwest to deal with the increase in absences.  *Id.*  For example, one vendor that could have provided Southwest with temporary employees, and had originally agreed to do so, backed out on the ground that it did not want to become involved in Southwest's "labor problems."  *Id.*

The operational problems created by increased sick calls were exacerbated by a week of extraordinarily severe weather in Chicago due to what meteorologists called a shift in the "polar vortex."  Goldberg Decl. ¶ 8 (App. 6-7).  On New Year's Eve and New Year's Day, Chicago temperatures dropped into single digits, increasing the work load because of increased requirements for deicing.  *Id.*  On January 2, 2014, things got much worse.  While Southwest expected based on historical experience that the spike in sick calls on New Year's Day to return to normal on January 2, roughly 30% of the ramp service employees called in sick while another 46 employees, representing 15% of the workforce, declined assignments under ten-hour rest rule. *Id.*  At the same time, a snow storm that Southwest thought would dissipate in the early morning continued all day, dumping a foot of snow at Midway.  *Id.*  The slow "turn times" caused by a combination of adverse weather and inadequate ramp service staffing created a snowball effect in which all of the available gates were filled with aircraft that could not depart, often because the flight crews were on incoming aircraft that could not reach a gate.  *Id.*  As a result, Southwest's Midway operations suffered what has been described as an "operational meltdown," with 66 aircraft on the ground at one point, many of which could not reach a gate to unload the passengers for several hours, and 55 empty aircraft stranded at Midway overnight, approximately

7

twice the normal number.  *Id.*

While the operational problems on January 2 were not directly attributable to attendance issues among the ramp service employees, the operational morass created even more work for a smaller workforce because the inability to get aircraft to and from the gates resulted in thousands of checked bags missing the connections to other cities. Goldberg Decl. ¶ 8 (App. 6-7).  By January 3, 2014, Southwest faced the daunting task of restoring 7500 pieces of luggage to customers spread throughout the U.S.  *Id.*  This included roughly 2000 to 3000 unclaimed bags at Southwest's baggage check area and some 5500 bags loaded on baggage carts on the tarmac, carts which were needed for the normal operations.  These bags had to be sorted and either delivered to the passenger in Chicago or sent on another Southwest flight to the passenger's arrival city.  *Id.*

After determining the extent of the staffing problem at Midway, Southwest dispatched a 737 aircraft from Dallas filled with both management personnel and roughly 60 ramp service or other employees who had volunteered to assist at Midway.  Goldberg Decl. ¶ 9 (App. 7-8). Southwest also recruited another 50 volunteers from other stations.  Over the next few days, most of these employees worked 16-hour days or longer but were hampered by various factors. *Id.*  Between January 3 and January 5, 2014, by using temporary employees from other cities to sort baggage and by cancelling more than half of the regularly scheduled flights to MDW, Southwest was able to stabilize the operations at Midway.  Goldberg Decl. ¶ 10 (App. 8).  The staffing problems among Midway-based ramp service employees continued, however, with 49 call-offs (17.5%) on January 3, 43 on January 4 and 44 on January 5, as well as a continuing pattern of employees invoking the ten hour rest rule and declining overtime.  *Id.*  Indeed, the stark differences between the work patterns of the temporary employees who flew in from other

cities to help and the reluctance of the Chicago-based employees created a strained relationship

between the two groups.  The Midway operations deteriorated further, however, on January 6,

2014, when the "high" temperature in Chicago dropped to -1 and the low dropped to -15.  *Id*.  On

that date, the number of call-offs jumped to 89, or roughly 30 percent of the employees

scheduled to work that day.  *Id*.  On the morning of January 7, 2014, after Southwest received

another 50 call-offs for the morning shift alone, Southwest determined that it had no option but

to take emergency steps to bring the sick leave levels at Midway under control.  *Id*.  As a result,

on January 7, 2014, Southwest's Managing Director – Ground Operations Steve Goldberg issued

a memorandum, a copy of which is attached to TWU's moving papers as Exhibit 1, declaring a

State of Operational Emergency.  *Id*.

Under Goldberg's memorandum, Southwest announced actions explicitly or impliedly

permitted under the Local 555-Southwest Agreement that it intended to take in light of the

operational emergency.  Goldberg Decl. ¶ 11 (App. 8-9).  First, Southwest required than any

employee who called in sick beginning on January 8, 2014, would be required to present a

doctor's note establishing that he or she was, in fact, ill, and that failure to do so could be

considered sick leave abuse.  *Id*.  Article 23-A of the Local 555-Southwest Agreement explicitly

provides that "[u]sing sick leave or sick pay for a purpose other than that intended constitutes

abuse.  Abuse of sick leave or sick pay shall warrant immediate termination."  Taken together

with Article 1.A –  which provides that the Agreement's purpose is to further "the well-being of

Southwest's Customers, the efficiency of operations, and the continuation of employment under

reasonable working conditions," and that it is "the duty of the Company, the Union, and the

Employees to cooperate fully to attain these purposes" – and  Article 2.C – which provides that

Southwest may issue reasonable rules and regulations "not in conflict with the terms and

9

conditions of this Agreement," Southwest believed that it had the right to implement a requirement that employees reporting sick provide a doctor's note during an operational emergency caused by abnormally high employee absence rates. *Id*.

Second, Southwest stated that employees who refused mandatory overtime would be considered for potential discipline. *Id*. Article 7 § I.6 of the Southwest-Local 555 Agreement provides Southwest with the right to require mandatory overtime in the event an insufficient number of employees sign up for voluntary overtime. *Id*. Article 20 sets forth the procedures with respect to Southwest's discipline of employees for just cause. Thus, Southwest had the right to discipline employees refusing mandatory overtime in violation of Article 7. *Id*.

The State of Emergency declared in Goldberg's memorandum of January 7, 2007, remained in effect for only 33 hours. Goldberg Decl. ¶ 12 (App. 9). Following issuance of the memorandum, call-offs rapidly dropped to normal levels, and by 9:30 a.m. on January 9, 2014, Southwest concluded that the memorandum could be rescinded. *Id*.

### C. The Contractual Basis for the Company's Declaration of Emergency.

While TWU seeks to characterize the Company's actions as a unique and unwarranted departure from past practice, it is not. The Company has declared such emergencies – requiring all employees who call in sick to provide a doctor's note – among flight attendants represented by the TWU since at least 1997, and has declared such emergencies among its flight attendant group six times since 2010 alone. Bennett Decl. ¶ 4 (App. 13).

In December 1997, the Company was experiencing an inordinate number of Flight Attendant sick calls adversely affecting operations. In response, the Company declared an operational emergency requiring, for the duration of the emergency, Flight Attendants who called in sick to report to the Company doctor. The Union grieved, claiming that the Company's action violated the parties' negotiated attendance policy and constituted a unilateral change to the

TWU Local 556-Southwest agreement.  Following a hearing, Arbitrator I.B. Helburn denied the

grievance.  *See Southwest Airlines and TWU 556* (Helburn, 1998).[4]

    In denying the grievance, Arbitrator Helburn noted that the negotiated attendance policy

prohibited abuse of sick leave; that the purpose clause of the CBA required the Company, the

Union and Flight Attendants to cooperate fully for the well-being of Southwest passengers and

the efficiency of operations; that the inordinate number of sick calls was adversely affecting

operations; and that the requirement was limited to the duration of the emergency.  In this regard,

Arbitrator Helburn stated:

> The Union has acknowledged the Company's right to guard against abuse,
> but the Union is unrealistic when it argues that investigation of possible abuse
> must be confined to questioning suspected Flight Attendants and/or their fellow
> employees….Thus what the Union proposes is viewed as tantamount to little or
> no effective investigation of sick leave abuse, which would reduce the relevant
> language…to a nullity.
>
> . . .
>
> The Company responded to the widespread possible abuse of sick leave in
> a limited, reasoned fashion.  The requirement to produce a doctor's note took
> advantage of the implicit right flowing from the Agreement.  It did not constitute
> a major change in working conditions ….
>
> . . .
>
> In addition, it is equally appropriate to resolve the issue from the
> perspective that an emergency existed because of the sick-out….In this case, the
> sick-out had created an emergency, as demonstrated by the late and cancelled
> flights….The emergency was for only a limited time….It is impossible to believe
> that the Agreement should be interpreted to allow a situation whereby a relatively
> small group of misguided employees can, with virtual impunity, ignore their
> contractual obligations and create an emergency which impairs the work of a vast
> majority and materially threatens the entire operation.

Bennett Decl. Ex. C at 14-16.

    In deciding to implement the declaration of operational emergency at issue here, the

---

[4]    Attached as Exhibit C to the Declaration of Christina Bennett filed concurrently herewith.

Company based its decision in large part on the Helburn decision. The relevant language in the Local 555-Southwest Agreement is virtually identical to the language in the Local 556-Southwest Agreement upon which Arbitrator Helburn decided, and the factual situations were substantially similar.

### D. The Challenged Fact-Finding Hearings.

In its motion for temporary restraining order and preliminary injunction, TWU also challenges Southwest's actions in conducting fact-finding hearings to consider potential discipline of 15 Midway ramp service employees for potential abuse of sick leave. Despite TWU's effort to tie these proceedings to the emergency declaration, these issues are unrelated. Declaration of Bill Venckus ("Venckus Decl.") ¶ 2. Article 23-A of the CBA provides that "[a]buse of sick leave or sick pay shall warrant immediate termination" and the Company concluded that the pattern of sick leave from some of the ramp service employees suggested potential abuse. *Id.* Article 20-G provides that no employee will be subject to discipline "without first have the benefit of a fact-finding." *Id.* Accordingly, on January 8 and 9, 2014, Southwest delivered Fact-Finding Notices to approximately 30 employees scheduling a meeting to discuss their attendance patterns. Copies of 15 of these Fact-Finding Notices are attached to TWU's moving papers as Exhibit C. *Id.* While TWU argues that Article 20-G-1-a requires fact finding hearings within 10 days of the events leading to potential discipline and objects to the notices included absences that occurred more than 10 days prior to the notices, all of the notices were sent within 10 days of the absences in question. *Id.*

However, the ten-day rule does not mean that the Company is disabled from considering the employee's history of sick leave usage. *Id.* In these cases, the potential discipline was based on a history of attendance problems such as a pattern of sick calls on holidays. Venckus Decl. ¶ 3. For example, a number of the employees had patterns of calling in sick on New Year's Eve or

New Year's Day, and it is the pattern that triggered the investigation. *Id. See also* TWU Ex. 3. Article 20-G-1-a could not be construed to limit the Company's ability to look back at the employee's attendance record. *See, e.g.*, *Southwest Airlines, Inc. and TWU Local 555*, at 38 n.12.

At this point, there have been no notices of fact finding hearings arising out of the declaration of operational emergency. Venckus Decl. ¶ 4. Because of evidentiary issues, the Company does not anticipate that any employees will be disciplined for refusal of mandatory overtime assignments. *Id.* Four employees who did not provide doctor's notes for sick leave on January 8, 2014, will likely receive a notice of fact-finding hearings at which the Company will evaluate the facts and circumstances to determine whether discipline is appropriate. *Id.*

## ARGUMENT

### I.   TWU HAS NOT IDENTIFIED ANY EMERGENCY REQUIRING A TEMPORARY RESTRAINING ORDER.

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable injury pending a hearing on a preliminary injunction. Under the law of this Circuit, emergency relief is appropriate only if (1) there is a substantial likelihood that the moving party will prevail on the merits, (2) there is a substantial threat of irreparable injury, (3) the threatened harm outweighs any injury that the injunction may do, and (4) the public interest supports an injunction. *E.g., Buchanan v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975).

In this case, TWU has not identified any need for emergency relief, much less met the showing required for issuance of a TRO. The sole questions raised by TWU's complaint and motion are (1) whether Southwest had the right to issue emergency work rules for a 33-hour period on January 8-9, 2014, in which the operations of Southwest's largest hub had been incapacitated by a heretofore unexplained increase in employee sick calls at the same time as a

dramatic weather event hampered operations; and (2) whether Southwest is properly considering

discipline of employees for sick leave abuse.  These disputes have no current effect on

Southwest's operations and can be resolved quickly through the arbitration procedures required

under the RLA.  Even if the court had jurisdiction to resolve the disputes, there is no reason for

asking it to do so on an expedited basis.

## II.     TWU'S CLAIMS RAISE A MINOR DISPUTE WITHIN THE EXCLUSIVE JURISDICTION OF AN ADJUSTMENT BOARD UNDER THE RLA.

### A.     Applicable Legal Principles

The RLA prevents disruption of the nation's rail and airline service by providing

mechanisms for the "prompt and orderly settlement" of disputes between labor and

management "growing out of grievances or out of the interpretation or application of

agreements covering rates of pay, rules or working conditions." 45 U.S.C. § 151a. Section

3 of the RLA channels all disputes over the "interpretation or application" of labor agreements to

final and binding arbitration.  45 U.S.C. § 153 First (i).  Arbitral boards have exclusive

jurisdiction to resolve the merits of these so-called "minor disputes."  *Conrail*, 491 U.S. at 304.

Because arbitral jurisdiction is exclusive, federal courts lack jurisdiction to decide the

merits of minor disputes.  *See, e.g.*, *Allied Pilots Ass'n v. American Airlines, Inc.*, 898 F.2d 462,

465 (5th Cir. 1990).  Likewise, unions cannot use self-help to circumvent the arbitration process

– strikes over minor disputes violate Section 3 of the RLA.  *Chicago River*, 353 U.S. at 39;

*Burlington N. R.R. v. BMWE*, 961 F.2d 86, 87 & n.3 (5th Cir. 1992).

Faced with this statutory obligation to arbitrate, a union, like TWU Local 555 here, will

sometimes claim that its interpretation of the agreement is so plainly right, and the carrier's so

wrong, that the carrier's proffered interpretation is just a sham designed to cover up an attempted

"unilateral change" in the collective bargaining agreement, which would be unlawful under § 2

Seventh of the RLA.  45 U.S.C. § 152 Seventh.  In such circumstances, the union will argue, the

issue is a "major dispute," not a minor dispute.

However, in its landmark *Conrail* decision, the Supreme Court held that when a carrier

and a union differ over the taxonomy of a labor dispute, the dispute must be classified as a

"minor dispute" unless the carrier's proffered interpretation is not "arguably justified" and is

"frivolous" "or obviously insubstantial."  491 U.S. at 306.  The Court explained as follows:

> Verbal formulations of [the legal test for identifying minor disputes] have differed
> over time and among the Circuits: phrases such as "'not arguably justified,'
> 'obviously insubstantial,' 'spurious,' and 'frivolous' have been employed."  These
> locutions are essentially the same in their result.  They illustrate the relatively
> light burden which the railroad must bear in establishing exclusive arbitral
> jurisdiction under the RLA.  To the extent that abstract words can deal with
> concrete cases, we think that the concept embodied in the language adopted by
> these . . . Courts of Appeals is correct. Where an employer asserts a contractual
> right to take the contested action, the ensuing dispute is minor if the action is
> arguably justified by the terms of the parties' collective-bargaining agreement.
> Where, in contrast, the employer's claims are frivolous or obviously insubstantial,
> the dispute is major.

*Id.* at 306-07 (citations omitted).[5]  Thus, the proper inquiry in this sort of case is limited to

determining whether the carrier's asserted contractual position is "arguably justified" or

"frivolous."  *Id.*

In applying the *Conrail* test, a court should be mindful that "[i]t is the role of the

arbitrator, not the court, to choose between the parties' interpretations of the Agreement."  *ALPA*

*v.  Eastern Air Lines, Inc.*, 869 F.2d 1518, 1524 (D.C. Cir. 1989).  Moreover, while technically

the carrier has a "relatively light" burden to show that a dispute is minor, as a practical matter

---

[5]      *See also BNSF Ry. v. BLET*, 337 F. App'x 409, 411-12 (5th Cir. 2009) (applying *Conrail*
test and concluding that dispute is minor); *Allied Pilots Ass'n v. American Airlines, Inc.*, 898 F.2d 462,
464-65 (5th Cir. 1990) (same); *Int'l Bhd. of Teamsters v. Southwest Airlines Co.*, 875 F.2d 1129, 1133-34
(5th Cir. 1989) (en banc) (dispute is minor if carrier's interpretation is "arguable"); *Ruby v. TACA Int'l
Airlines, S.A.*, 439 F.2d 1359, 1363 n.5 (5th Cir. 1971) (holding that dispute is major only if carrier's
interpretation is "wholly spurious").

there is a strong presumption in favor of minor disputes. *See, e.g.*, *AFA v. Mesa Air Group*, 567

F.3d 1043, 1047 (9th Cir. 2009); *see also Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1414 (8th

Cir. 1997) ("[T]here is a presumption that disputes between railroads and their unionized

employees are minor, and thus, arbitrable.") (citing *Conrail*, 491 U.S. at 307).  Indeed, "if there

is any doubt as to whether a dispute is major or minor, a court will construe the dispute to be

minor." *RLEA v. Norfolk & Western R.R.*, 833 F.2d 700, 705 (7th Cir. 1987); *see also BLE v.*

*Burlington N. R.R.*, 838 F.2d 1102, 1111 (9th Cir. 1988) ("When in doubt, courts construe

disputes as minor.").

   This means that a carrier's interpretation should not be deemed frivolous if it is

"questionable" or "improbable," or even if the court believes that it is affirmatively wrong. *See*

*NRLC v. IAM*, 830 F.2d 741, 749 (7th Cir. 1987); *BRS v. Burlington N. R.R.*, 893 F.2d 199, 205

(8th Cir. 1990).  In fact, virtually every court of appeals to face the "major/minor" question in the

last twenty-five years has concluded that any good-faith interpretation of an agreement cannot be

dismissed as "frivolous."[6]

   Moreover, a carrier is free to act on its interpretation of the collective bargaining

agreement pending the outcome of arbitration. *See, e.g., Conrail*, 491 U.S. at 304 ("[T]his Court

never has recognized a general statutory obligation on the part of an employer to maintain the

---

[6]   *See, e.g.*, *BNSF Ry. v. BLET*, 337 F. App'x 409, 411-12 (5th Cir. 2009); *ALPA v.*
*Guilford Transp.*, 399 F.3d 89 (1st Cir. 2005);  *AFA v. Horizon Air Indus., Inc.*, 280 F.3d 901 (9th Cir.
2001); *APA v. ABX Air, Inc.*, 274 F.3d 1023 (6th Cir. 2001); *BMWE v. Union Pac. R.R.*, 19 F. App'x 731
(10th Cir. 2000); *BLE v. Long Island R.R.,* 85 F.3d 35 (2d Cir. 1996); *AFA v. United Airlines*, 976 F.2d
102, 105 (2d Cir. 1992); *BRC  v. Missouri Pac. R.R.*, 944 F.2d 1422, 1429 (8th Cir. 1991); *RLEA v.*
*Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990); *ALPA v. Alaska Airlines, Inc.*, 898 F.2d 1393 (9th Cir.
1990); *American Airlines*, 898 F.2d at 464-65; *UTU v. CSX*, 893 F.2d 584 (3d Cir. 1990); *SMWIA v.*
*Burlington N. R.R.*, 893 F.2d 199 (8th Cir. 1990); *ALPA  v. Eastern Air Lines*, 869 F.2d 1518 (D.C. Cir.
1989); *Chicago & N.W. Transp. v. IBEW*, 829 F.2d 1424 (7th Cir. 1987); *BRS v. Burlington N. R.R.*, 829
F.2d 617 (7th Cir. 1987); *RLEA v. Norfolk & W. Ry.*, 833 F.2d 700 (7th Cir. 1987); *BRAC v. Atchison, T.*
*& S.F. Ry.*, 847 F.2d 403 (7th Cir. 1988); *NRLC v. IAM*, 830 F.2d 741 (7th Cir. 1987).

status quo pending the Board's decision . . . ."); *see also Bhd. of Locomotive Firemen & Enginemen v. S. Pac. Co.*, 447 F.2d 1127, 1132 (5th Cir. 1971).

The *Conrail* test has been applied in a number of cases where the underlying dispute turns on interpretation of implied contractual terms, or even on the absence of contractual terms.[7] *See, e.g., Conrail*, 491 U.S. at 313 (finding dispute to be minor because it turned on "implied contractual terms, as interpreted in light of past practice").  In cases where a carrier has relied on contractual silence to argue that it retains the right to act unilaterally, courts have routinely deemed the disputes to be minor.  *See, e.g., Airline Profs. Ass'n v. APX Air, Inc.*, 400 F.3d 411, 415-16 (6th Cir. 2005) (where collective bargaining agreement is silent on disputed point, dispute is minor); *Chicago & N.W. Transp. Co. v. RLEA*, 908 F.2d 144, 153 (7th Cir. 1990) (same); *Empresa Ecuatoriana de Aviacion v. Machinists*, 690 F.2d 838, 843 (11th Cir. 1982) (disputes about extent of managerial prerogatives are minor disputes).

In classifying a dispute as major or minor under the *Conrail* standard, a court may and should assess the sufficiency of the carrier's interpretation in light of any source or justification that an arbitrator might employ in deciding the merits of the dispute.  *See Conrail*, 491 U.S. at 311-12.  Thus, courts routinely examine various factors beyond the text of the agreement itself, including the "parties' 'practice, usage and custom,'" bargaining history, analogous agreements, arbitration awards, assertions of management prerogative, and the like. *BMWE*, 138 F.3d at 641; *see also, e.g., AFA v. Mesa Air Group*, 567 F.3d  at 1047-48 (management rights); *American Airlines*, 898 F.2d at 465 (examining past practice regarding testing and medical exams);

---

[7]       It is well-settled that labor agreements under the RLA include both express and implied terms.  *E.g., RLEA v. Norfolk & W. Ry*., 833 F.2d 700, 705 (7th Cir. 1987) ("it is common practice to omit from written agreements non-essential practices that are acceptable to both parties.  The parties' collective bargaining agreement, therefore, includes both the specific terms set forth in the written agreement and any well established practices that constitute a 'course of dealing' between the carrier and employees.").

*General Committee*, 893 F.2d at 591-92 (referring to past practice); THE RAILWAY LABOR ACT, ABA Section of Labor and Employment Law (3d ed. 2012) at 448-53 (collecting cases).

Moreover, in making this determination, a court need not, and indeed may not, resolve factual questions arising from the dispute.  Rather, factual issues – including fact questions about the parties' past practices – must be left to the arbitrator. *See, e.g.*, *Long Island R.R. v. IAMAW*, 709 F. Supp. 376, 387-88 (S.D.N.Y. 1989) ("factual dispute" over the content of the parties' "working relationship" was an issue to be decided in arbitration); *Sheet Metal Workers Int'l Ass'n  v. Kansas City S. Ry.*, 2009 U.S. Dist. LEXIS 104376 (W.D. Miss. Nov. 9, 2009) ("questions of fact" are "for the arbitrator to resolve").  Thus, to the extent that a dispute turns on a disputed issue of fact, that would indicate that the dispute should be classified as minor and referred to arbitration.

With these principles in mind, we now turn to the current dispute, explaining why Southwest has at least an "arguable" basis under the parties' existing agreements for its ability to declare a temporary operational emergency and require employees to provide a doctor's note if reporting sick during that period.

### B.      The Parties' Dispute Is a Minor Dispute

The parties' dispute is minor because, contrary to TWU Local 555's argument, it can be resolved by the interpretation or application of existing collective bargaining agreement terms, including (1) express agreement language arguably giving Southwest the right to take the challenged actions, (2) management rights, and (3) implied terms based on past practice.

### 1.      Agreement Language Supports Southwest

TWU Local 555 contends that there is no basis in the parties' collective bargaining agreement supporting Southwest's ability to declare an operational emergency and take related action.  However, Southwest's position is that the Southwest-Local 555 Agreement does support

Southwest's ability to declare an operational emergency, discipline employees refusing

mandatory overtime during such operational emergency, and require a doctor's note for

employees reporting sick during such operational emergency.

First, Article 1.A of the Southwest-TWU 555 Agreement provides that its purpose to

further "the well-being of Southwest's Customers, the efficiency of operations, and the

continuation of employment under reasonable working conditions.  It is recognized to be the

duty of the Company, the Union, and the Employees to cooperate fully to attain these purposes."

Article 2.C further provides that Southwest may issue reasonable rules and regulations "not in

conflict with the terms and conditions of this Agreement," and Article 2.D provides that "[t]he

right to manage and direct the work force, subject to the provisions of this Agreement, is vested

in and retained by the Company."   Article 23.A provides that "[u]sing sick leave or sick pay for a

purpose other than that intended constitutes abuse.  Abuse of sick leave or sick pay shall warrant

immediate termination."  The Union argues that Southwest is "unilaterally altering material

terms of contract" between the parties.  (Pl. Mem. at 11.)  However, taken together, these

contract provisions certainly provide Southwest with a "non-frivolous" position that they allow

Southwest to implement a requirement that employees reporting sick provide a doctor's note

during an operational emergency and higher than usual employee absence rates.

Indeed, as discussed above, an arbitrator has recognized Southwest's ability to do just

that.  The arbitrator's ruling in *Southwest Airlines Company & Transport Workers Union, AFL-*

*CIO Local 556*, Grievance Nos. 1139 & 1154 (Helburn, 1998)[8], fully supports Southwest's

position that it may declare an operational emergency and impose temporary requirements on

sick leave usage.   Specifically, the arbitrator found that "[t]he Company responded to the

---

[8]     Attached as Exhibit C to the Declaration of Christina Bennett, filed concurrently herewith.

widespread possible abuse of sick leave in a limited, reasoned fashion.  The requirement to produce a doctor's note took advantage of the implicit right flowing from the Agreement.  It did not constitute a major change in working conditions. . . ." *Id.* at 15.  Similarly here, Southwest relied upon very similar agreement provisions for a very limited 1.5 day period in which it declared an operational emergency precipitated by extreme weather conditions affecting the Chicago area.  When an arbitrator has previously upheld Southwest's position, that position can hardly be deemed "frivolous."

TWU Local 555 also challenges Southwest's actions in conducting fact finding hearings to consider potential discipline of 15 Midway ramp service employees for potential sick leave abuse.  As noted above, Article 23-A of the collective bargaining agreement provides that "[a]buse of sick leave or sick pay shall warrant immediate termination," and Southwest concluded that the pattern of sick leave by some of the ramp service employees suggested potential abuse.  In accordance with the discipline procedures in Article 20-G, Southwest therefore sent employees a Fact-Finding-Notice.  TWU Local 555 argues that Article 20-G-1-a requires that fact finding hearings be conducted within 10 days, and objects to the fact that the notices for these employees included absences occurring more than 10 days prior, *i.e.*, the employee's history of attendance problems.  Southwest's position that it complied with Article 20-G-1-a by sending the Fact-Finding-Notices to these employees within 10 days of the most recent absences which prompted the fact-finding hearings cannot be considered frivolous.

Southwest's contractual justifications for its actions in this case are compelling and quite far from "frivolous."  Indeed, as demonstrated above, Southwest's justification is based on the plain language of the parties' agreement.  Thus, the parties' dispute is a minor dispute and must

be submitted to mandatory and binding arbitration, with Southwest free to implement its

interpretation of the agreement in the interim.

### 2. Southwest Arguably Retains a Managerial Prerogative

Article 2 of the Southwest-TWU Local 555 Agreement contains an explicit management

rights clause, which provides:

> C. **Reasonable Work Rules.**  Employees covered by this Agreement shall be governed by all reasonable Company rules and regulations previously or hereafter issued by proper authority of the Company which are not in conflict with the terms and conditions of this Agreement and which have been made available to covered Employees and the Union Office prior to becoming effective.

> D.  **Management Rights.**  The right to manage and direct the work force, subject to the provisions of this Agreement, is vested in and retained by the Company.

Under this clause, Southwest at least arguably has the right to take actions not prohibited by the

agreement.

TWU Local 555 argues that because the Southwest-TWU Local 555 Agreement does not

set forth "emergency" operating procedures or specifically require medical documentation for

sick leave, Southwest's actions violate the Agreement.  (Pl. Mem. at 12.)  But the Union can

point to no collective bargaining agreement provision *prohibiting* the action taken by Southwest,

and entirely ignores the management rights clause contained in Article 2.  As applied in this case,

the principle of reserved rights means that Southwest retains the power to declare an operational

emergency and take related action unless specifically restricted by the applicable collective

bargaining agreements.  There are no provisions in the relevant agreements that restrict the right

of Southwest to do so.

The Fifth Circuit has held that similar disputes over the right of a carrier to implement

new policies or procedures are minor if the carrier can point to an "arguable" managerial

prerogative as a basis for its actions.  In *Teamsters v. Southwest*, the issue involved the carrier's

implementation of a "comprehensive and detailed" drug and alcohol testing program.  875 F.2d at 1131.  A union objected, claiming that the program was a "unilateral change," and the district court enjoined the carrier's action. *Id.* at 1132.  But the Court of Appeals reversed.  It held that a management rights clause similar to the one in the Southwest-TWU Local 555 Agreement "at least *arguably* grants management the right to enforce . . . this drug testing program." *Id.* at 1135 (emphasis in original). While a contrary interpretation may be possible, the Court held, that does not bar "the contrary view that the clause binds employees to any and all rules that do not conflict with the agreement and that are promulgated by management with advance notice." *Id.*

Other circuit case law supports the same conclusion.  For example, in *Association of Professional Flight Attendants v. American Airlines*, 1988 WL 25428 (9th Cir. 1988), the air carrier, in response to a problem with the theft of liquor, instituted an in-flight "audit program." *Id.* at *2.  The audit program included occasional in-flight surveillance of flight attendants.  The union argued that the airline's unilateral implementation of in-flight surveillance violated § 2 Seventh and so constituted a major dispute. *Id.*  The Ninth Circuit disagreed, holding that although the collective bargaining agreement did not explicitly permit the airline to implement the in-flight audit program, it was a "reasonable extension" of the airline's managerial discretion, and therefore a minor dispute. *Id.  See also, e.g.,  Airline Professionals Ass'n v. ABX Air, Inc.*, 274 F.3d 1023, 1029 (6th Cir. 2001) (dispute over airline's unilateral decision to implement random searches of employee belongings was minor, as the airline's policy was arguably justified as within its managerial discretion); *AFA v. Mesa Air Group*, 567 F.3d at 1048-49 (where management can arguably claim "residual" managerial prerogative, dispute is minor so long as it is arguable that no agreement provision expressly bars the carrier's action); *Rutland Ry. v. BLE*, 307 F.2d 21, 36 (2d Cir. 1962) (same).

In light of this authority and the management rights clause in the collective bargaining agreement, the dispute over the operational emergency is plainly minor. Given the absence of any contractual restrictions, and the presence of the management rights clause, it is at least arguable that Southwest retains the right to declare an operational emergency and institute a requirement that employees reporting sick provide a doctor's note for the duration of the emergency. An arbitrator could easily conclude that, in light of Southwest's significant operational concerns and the lack of any express or implied contractual prohibitions, the carrier is entitled to proceed. This is not to say, of course, that the union cannot try to bargain contractual restrictions for the future. But in the interim, the carrier is allowed to act on its interpretation of the agreements. *See Southwest*, 875 F.2d at 1133.

### 3. Past Practice Arguably Supports Southwest's Position.

Finally, even if Southwest did not at least "arguably" possess managerial discretion to declare an operational emergency and require employees to provide medical documentation when reporting sick during that emergency, it would still have a non-frivolous argument that it is permitted to do so based on implied agreements arising from past practice. Southwest has declared such emergencies, including the requirement that employees who call in sick provide a doctor's note, among flight attendants represented by the TWU since at least 1997, and can point to six separate instances since 2010 in which it declared such operational emergency among its flight attendant group. These facts arguably support Southwest's claim that it has the right to declare an operational emergency and institute a related requirement for employees reporting sick among its ramp workers also represented by TWU, who are subject to similar agreements with the Company.

Debates about the nature or significance of past practices – or how those practices should be weighed against arguably competing practices – are necessarily questions for the arbitrator.

23

*BNSF Ry. Co. v. United Transp. Union*, 2010 U.S. Dist. LEXIS 137266 (N.D. Tex. Dec. 28, 2010) ("a dispute over the effect the parties' past practices have on their current contractual relationship" is a minor dispute); *BMWE v. Union Pac. R.R.*, 475 F. Supp. 2d 819 (N.D. Iowa 2007) (assessment of the significance of asserted "decades-old" practices is a matter for arbitration, and thus dispute over change in carrier attendance practices is minor).

### III.    TWU LOCAL 555 CANNOT SHOW IRREPARABLE HARM

Without providing specifics, TWU Local 555 argues that an injunction is necessary to prevent irreparable harm to its members, "given the state and nature of performance by the parties to the CBA." (Pl. Mem. at 10.)   It simply assumes the existence of "bargained-for rights," and says that it is being deprived of those rights. *Id.*

That is not so. Even under the facts as alleged by the union, the state of operational emergency in Chicago has expired. There is no pending emergency anywhere on the Southwest network. The union hints that the issue may reoccur, but that is not a sufficient basis for emergency injunctive relief. *See, e.g., Firmin v. Richard Constr., Inc.*, Civ. A. No. 12-1391, 2012 U.S. Dist. LEXIS 81048, at *2-3 (E.D. La. June 11, 2012) (dissolving temporary restraining order as Plaintiff's fear of future harm was too speculative to constitute immediate injury); *Pate v. Ameriquest Mortg. Co.*, No. 4:10cv201, 2010 U.S. Dist. LEXIS 65472, at *1 (E.D. Tex. July 1, 2010) (denying motion for temporary restraining order as moot where plaintiffs were not threatened with any immediate harm); *RCM Techs., Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70, 74 (D.D.C. 2007) (denying application for temporary restraining order where plaintiff's alleged injuries were speculative and non-specific).   In order for an injunction to issue, there has to be some ongoing conduct to enjoin threatening the union with immediate harm, and here there is none.

## IV. THE BALANCE OF HARMS AND THE PUBLIC INTEREST SUPPORT SOUTHWEST

The balancing of potential harms weighs greatly in favor of not granting injunctive relief. Contrary to the Union's allegations of irreparable harm, ramp agents found to have been wrongly affected, if any, by Southwest's declaration of an operational emergency and requirement that employees reporting sick provide a doctor's note during the operational emergency can be made whole economically in arbitration.

By contrast, Southwest would be irreparably harmed by an injunction. As discussed above, *Conrail* gives Southwest the legal right to implement its interpretation of the collective bargaining agreement so long as the dispute is minor. *See Conrail*, 491 U.S. at 304. And if a status-quo injunction is entered, Southwest can never recover that foregone right, even if it ultimately prevails in arbitration. Moreover, Southwest's operations will be seriously impeded if it loses the operational flexibility to declare and operational emergency and maximize the number of available employees in the event of another weather emergency. That legal injury to Southwest is both meaningful and indisputable.

Likewise, the public interest weighs strongly against an injunction. Southwest's actions were taken in order to ensure timely flight operations at one of the busiest airports in the nation. Depriving Southwest of the ability to take temporary or emergency measure to address high rates of employee absenteeism would increase the chances of severe flight delays for the travelling public.

## CONCLUSION

For all of the foregoing reasons, TWU Local 555's application for a temporary restraining order should be denied.

Dated: January 15, 2014.

/s/ Donald J. Munro
Tom A. Jerman (*pro hac vice* application pending)
Donald J. Munro (D.C. Bar No. 453600)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939
(202) 626-1700 FAX
tjerman@jonesday.com
dmunro@jonesday.com

Brian M. Jorgensen
(Texas State Bar No. 24012930)
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201-1568
(214) 220-3939
(214) 969-5100
bmjorgensen@jonesday.com

J. Joe Harris
(Texas Bar No. 090620000)
Senior Labor Counsel
Southwest Airlines Co.
2702 Love Field Drive
(214) 792-4561
(214) 792-4066
Joe.harris@wnco.com


Counsel for Defendant
Southwest Airlines Co.

26

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2014, I caused to be electronically filed Defendant's

Opposition to Plaintiff's Application for Temporary Restraining Order and Preliminary

Injunction using the CM/ECF system, which will automatically send e-mail notification of such

filing to the following attorneys:


Edward Cloutman, IV
Edward B. Cloutman, III
Cloutman & Cloutman, L.L.P.
3301 Elm Street
Dallas, TX  75226-2562
crawfishll@prodigy.net
edclounnan@prodigy.net


/s/ Donald J. Munro